# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF                          :
AGRICULTURE EMPLOYEES,                           :
139 Altama Connector                             :
P.O. Box 312                                     :
Brunswick, GA 31525                              :
                                                 :
            *Plaintiff,*                         :
                                                 :
      v.                                         :
                                                 :
DONALD J. TRUMP                                  :     **COMPLAINT FOR**
in his official capacity as                      :     **DECLARATORY AND**
President of the United States                   :     **INJUNCTIVE RELIEF**
1600 Pennsylvania Avenue, NW                     :
Washington, DC 20500,                            :
                                                 :
BROOKE L. ROLLINS                                :     Case No. 25-cv-02657
in her official capacity as Secretary            :
U.S. Department of Agriculture                    :
1400 Independence Ave SW                         :
Washington, DC 20250,                            :
                                                 :
      and                                        :
                                                 :
SCOTT KUPOR                                       :
in his official capacity as Director             :
Office of Personnel Management,                   :
1900 E Street, NW                                :
Washington, DC  20415,                           :
                                                 :
            *Defendants.*                        :

## Introduction

1.    The Plaintiff National Association of Agriculture Employees ("NAAE")

is a labor union that represents the employees of the Plant Protection and

Quarantine ("PPQ") organizational unit in U.S. Department of Agriculture. The

primary function of the employees represented by NAAE is to conduct inspections of

incoming passengers and cargo as well as surveys of crops and rangeland for plant pests and diseases, and to assist in eradication of plant pests and diseases when they are found. Any work that was once performed by these employees that related to national security was transferred to Customs and Border Protection in the Department of Homeland Security by the Homeland Security Act of 2002. PPQ employees have no responsibility for guarding the nation against bioterrorism or agroterrorism, nor are they trained in those matters. Nonetheless, President Trump issued Executive Order No. 14,251 on March 27, 2025 revoking PPQ employees' collective bargaining rights (along with the collective bargaining rights of two-thirds of the Federal workforce) ostensibly because the primary function of PPQ is "national security work." Ironically, this Executive Order did not revoke the collective bargaining rights of the employees of U. S. Customs and Border Protection, to whom PPQ's employees' national security work was earlier transferred. Because PPQ employees only protect the nation's crops and food supply from natural threats posed by plant pests and diseases, rather than from espionage, sabotage, subversion or foreign aggression, NAAE has brought this suit to challenge the Executive Order.

## Jurisdiction, Venue and Parties

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under federal law, including the United States Constitution.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Defendants reside here and because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

4.     The Plaintiff National Association of Agriculture Employees ("NAAE") is a national labor organization that is the collective bargaining representative of approximately 1,500 employees of Plant Protection and Quarantine, an organizational unit of the Animal and Plant Health Inspection Service ("APHIS") of the United States Department of Agriculture.

5.     The Defendant Donald J. Trump is the President of the United States and is being sued in his official capacity. In that capacity, he issued Executive Order No. 14,251.

6.     The Defendant Brooke L. Rollins is the Secretary of the United States Department of Agriculture ("USDA") and is being sued in her official capacity. In that capacity, she has enforced Executive Order No. 14,251 within APHIS and PPQ.

7.     The Defendant Scott Kupor is the Director of the U.S. Office of Personnel Management. He is sued in his official capacity. In that capacity, he provides guidance and direction to Federal agencies on the application and enforcement of Executive Order No. 14,251.

## Factual Allegations

### The NAAE and its bargaining unit.

8.     The Plaintiff, then known as the Federal Plant Quarantine Inspectors National Association, was initially recognized as the exclusive collective bargaining

representative of employees of USDA's Plant Protection and Quarantine organizational unit in 1963 pursuant to Executive Order No. 10,988, which for the first time formalized collective bargaining in the Federal government.

9.      In 1978, Congress enacted Chapter 71 of the Civil Service Reform Act, also known as the Federal Service Labor-Management Relations Statute (hereinafter "Chapter 71" or "FSLMR Statute"), which created the Federal Labor Relations Authority and, for the first time, granted collective bargaining rights to most of the Federal civil service by statute.  The Plaintiff changed its name to NAAE in 1985 and has continued to represent most professional and non-professional employees of PPQ (other than supervisors, management personnel and certain administrative and higher-grade professional employees) under the FSLMR Statute. Its most recent collective bargaining agreement became effective in 2024 and does not expire until 2028.

10.      The Plant Protection and Quarantine organizational unit of APHIS has as its primary function to protect our Nation's agriculture and natural resources from invasive pests and diseases.

a.      When shipments containing live plants or propagative material arrive in the United States, U.S. Customs and Border Protection transfers those shipments to an APHIS plant inspection station. PPQ experts inspect shipments to confirm they are free of pests and diseases that could harm U.S. agriculture or natural resources. Once a shipment clears a plant inspection station, it is allowed to enter the United States.

4

b.      PPQ conducts an overseas commodity preclearance program for fresh fruits and vegetables in 25 countries before their shipment to the United States to ensure they are free from pests and diseases.

c.      PPQ inspects baggage of all passengers and cargo departing Hawaii or Puerto Rico bound for the continental United states to prevent the introduction of non-native agricultural pests and diseases into the mainland.

d.      PPQ conducts a Smuggling Interdiction and Trade Compliance program of restricted plants and plant products, both at ports of entry and after they enter commerce in the U.S.

e.      PPQ issues USDA Phytosanitary Certificates for plants, seeds, and plant products for export from the United States to attest they are free of pests and diseases to comply with other nations' quarantine programs and import restrictions.

f.      PPQ conducts a Cotton Pests Program that works with growers, the cotton industry, States and Mexico to eradicate the boll weevil from cotton-producing areas of the U.S. and northern Mexico.

g.      PPQ conducts the Field Crop and Rangeland Ecosystems Pests program to protect crops and rangelands from the establishment or spread of invasive or economically significant pests, such as grasshoppers, Morman Crickets, imported fire ants, Karnal Bunt (a fungal disease), Witchweed (a parasitic plant), Roseau Cane Scale and Cogongrass (an invasive perennial weed) through surveys and eradication efforts. Other PPQ pest detection programs carry out plant, specialty crop, tree and wood pest surveys in

5

cooperation with state departments of agriculture, universities and industry partners.

11.    Of the 1,500 or so PPQ employees represented by Plaintiff NAAE, approximately 500 are "Plant Health Safeguarding Specialists" and another 400 are "Plant Protection Technicians" who assist the Plant Health Safeguarding Specialists. Among the other predominant occupations and positions in PPQ represented by Plaintiff NAAE are approximately 60 Agriculturalists, 70 Biological Science Laboratory Technicians, 70 Entomologists, 30 Biologists or Molecular Biologists, 10 Botonists, 25 Plant Pathologists, 25 Pest Survey Specialists, 75 Smuggling Interdiction and Trade Compliance Officers, and 20 Tree Climbers.

### PPQ is not engaged in national security work.

12.    The FSLMR Statute contains several provisions under which employees may be excluded from coverage based on their or their agency's involvement in national security. None are applicable to the work of PPQ or the NAAE bargaining unit.

13.    The FSLMR Statute provides that:

The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).

14.    The FSLMR Statute also provides that bargaining units shall not be appropriate if they include employees "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." 5 U.S.C. § 7112(b)(6).

15.    Following "9/11," any of the duties of APHIS and PPQ that were arguably within the realm of national security, along with over 3,000 agriculture inspectors, were transferred from APHIS and PPQ to U.S. Customs and Border Protection in the newly created Department of Homeland Security ("DHS") by the Homeland Security Act of 2002, 6 U.S.C. § 231. This included inspecting international passengers, luggage and cargo at ports of entry as well as foreign arrival vessels and aircrafts and crews for plant pests and diseases. In 2003, USDA and DHS entered into a Memorandum of Agreement with several appendices that effectuated the transfer of any national security functions from APHIS to DHS. Article 1 of this Memorandum explains:

> Historically, the USDA Animal and Plant Health Inspection Service (APHIS) Agriculture Quarantine Inspection (AQI) program has focused mainly on preventing the introduction of harmful pests and diseases into the United States. Now, the threat of intentional introduction of these pests or pathogens as a means of biological warfare or terrorism is an emerging concern that the United States must be prepared to deal with effectively. Guarding against such an eventuality is important to the security of the Nation. Failure to do so could disrupt American agricultural production, erode confidence in the U.S. food supply, and destabilize the U.S. economy. The transfer of USDA agriculture inspectors, with their expertise in biology and agricultural inspection, provides DHS the capability to recognize and prevent the entry of organisms that might be used for biological warfare or terrorism.

https://www.aphis.usda.gov/plant-protection-quarantine/about/moa (last visited

August 4, 2025).

16.     The Homeland Security Act vested the U.S. Customs and Border

Protection ("CBP") with responsibility to "enforce and administer the laws relating

to agricultural import and entry inspection." 6 U.S.C. § 2119(c)(11). The former PPQ

inspection officers who were transferred to DHS now work as CPB "Agriculture

Specialists" alongside CBP Officers at ports of entry, enforcing APHIS' regulations.

17.     In 2003, PPQ management claimed that its Smuggling Interdiction

and Trade Compliance Officers should not be included in NAAE's bargaining unit

because they were "engaged in . . . investigative . . . work which directly affects

national security" because their work "directly affects the economic and productive

security of the United States" by combating smuggling of prohibited agricultural

products. Relying on FLRA case law defining national security work, a hearing

officer of the FLRA ruled that the Smuggling Interdiction and Trade Compliance

Officers were not engaged in work that "directly affects national security." "It is, of

course, beyond dispute that unlawful entry into the country of plant and animal

pests can and have caused substantial economic harm to the agricultural sector of

the United States economy," wrote the hearing officer. But in order to fit within the

definition of "national security," employees must "deal with protecting the national

economy as a whole from 'espionage, sabotage, subversion, foreign aggression, and

other illegal acts which adversely affect the national defense.'" *U.S. Dep't of*

*Agriculture, Animal Plant Health Inspection Service, Plant Protection and*

*Quarantine*, WA-RP-01-0049, slip op. at 18, 19. (August 15, 2003), *quoting Dep't of Energy, Oak Ridge Operations,* 4 F.L.R.A. 644, 655-656 (1980).

### The NAAE files "grievances to block Trump policies."

18.    Following his inauguration, President Trump undertook several major initiatives to attack the Federal civilian workforce. NAAE vigorously used the legitimate means provided to it under the FSLMR Statute and its collective bargaining agreement to fight back against implementation of those initiatives at PPQ to protect the welfare of its members.

19.    On January 20, 2025, the Office of Personnel Management issued guidance on probationary periods, advising agencies that probationary periods are "an essential tool for agencies to assess employee performance and *manage staffing levels,"* directing agencies to provide OPM with a list of all probationary employees, and instructing agencies to "promptly determine" whether probationary employees should be retained. On February 11, 2025, the President issued an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force. . ." and to develop"[r]eorganization [p]lans." According to public reporting, on February 13, 2025, OPM officials met with federal agency leaders to provide guidance on how to carry out probationary termination actions as part of the broader effort to restructure and downsize the federal workforce.

20.    Then, on February 14, OPM directed agencies to terminate all probationers unless they were encumbering positions in "mission critical areas." "We have asked that you separate probationary employees that you have not

identified as mission critical no later than end of the day, Monday, 2/17" the instruction stated. CHCO Council Memo to CHCOs and Deputy CHCOs, *Subject: Follow-up: CHCO Council Special Session*, (Feb. 14, 2025). As a result, on February 14, 2025 PPQ terminated all its probationary employees. In addition, as part of this reduction-in-force, at least 13 term employees of PPQ, whose term appointments are customarily renewed, were notified that their appointments were ending.

21.    On March 12, 2025 NAAE filed a grievance on behalf of the terminated probationary and term employees alleging that PPQ failed to provide these employees with their rights under OPM's reduction-in-force regulations and that their termination violated the NAAE collective bargaining agreement. PPQ denied the union's first step grievance and NAAE advanced the grievance to step 2 and step 3 of the negotiated grievance procedure contained in the NAAE collective bargaining agreement, to which management failed to provide a response.

22.    On January 20, 2025 President Trump issued a Memorandum directing all agencies to terminate their telework programs. When NAAE received notice from PPQ that employees' telework agreements were being terminated, the union demanded to bargain over the impact and implementation of the end of telework. When PPQ management refused NAAE's bargaining demand, the union filed another grievance under the parties' collective bargaining agreement, to which PPQ has refused to respond.

### *Defendant Trump issues an Executive Order to punish those unions who, like NAAE, file grievances that challenge his policies.*

23.     On March 27, 2025, Defendant Trump issued Executive Order No. 14,251, *Exclusions from Federal Labor-Management Programs*, 90 Fed. Reg. 14553 (Mar. 27, 2025), which invoked 5 U.S.C. §7103(b) and terminated the collective bargaining rights of employees in ten Cabinet level departments and seven independent agencies whose "primary function" is ostensibly national security, allegedly because the Federal Service Labor Management Relations Statute "cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations."

24.     Among the agencies and subdivisions that were excluded from coverage of the FSLMR Statute in Section 2 of Executive Order 14251 were "[t]he following agencies or subdivisions of the Department of Agriculture:

*         *         *

(b)     Animal and Plant Health Inspection Service."

25.     President Trump's Executive Order strips collecting bargaining rights from three-quarters of the federal employees who are currently represented by federal sector unions, demonstrating that it was not a targeted assessment based on national security concerns. *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com, available at https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010 (Mar. 28, 2025).

26.     The White House issued a "fact sheet" simultaneously with the Executive Order in which it candidly admitted that the President's Executive Order was issued to curtail the power of and to punish those particular labor organizations who, like NAAE, have ostensibly "obstructed" the President's efforts to illegally dismantle the Federal government and to illegally dismiss large segments of the Federal workforce these labor organizations represent by filing grievances:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.
> Certain Federal unions have declared war on President Trump's agenda.
>
> The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
>
> For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.
>
> Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.
>
> President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

*Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements,*

https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited August 12, 2025).

27.    What is equally revealing about the scope of the exclusions in Executive Order 14251 are the agencies and employees that were *not* excluded: The President did not exclude those agencies or employees "with unions who work with him" politically and who do not oppose his efforts to neuter the civil service or, as he disparagingly calls it, "the deep state." Section 2 of the Executive Order carves out protections for the unions who have not opposed his policies or politics:

> Notwithstanding the forgoing, nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code:
>
> > (a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons;

The country's largest law enforcement union, the National Fraternal Order of Police ("FOP"), endorsed President Trump's candidacy in 2016, 2020, and 2024, and President Trump has regularly touted those endorsements. And the largest firefighters' union in the country, the IAFF, after having exclusively supported Democratic presidential candidates for more than 50 years, broke with that tradition, declining to endorse either candidate in the 2016 and 2024 elections and in 2020, then-candidate Trump touted his endorsement by one of IAFF's larger chapters.

28.    The Executive Order excluded 12 subdivisions of the Department of Homeland Security; but it did ***not*** exclude U.S. Customs and Border Protection, to which APHIS's national security responsibilities had been transferred by the Homeland Security Act of 2002. See Section 2, subsection 1-407. The National Border Patrol Council represents approximately 18,000 employees of Customs and

Border Protection, and it endorsed Donald Trump for election in 2016, 2020 and 2024.

29.     Also on March 28, the Acting Director of the Office of Personnel Management issued a Memorandum to Heads and Acting Heads of Departments and Agencies instructing them to discontinue participation in ongoing and future grievance procedures, to disregard extant collective bargaining agreements, to prohibit union representatives from using "official time" authorized by statute and collective bargaining agreements for representational purposes, to terminate the unions' use of agency resources such as office space, and, in order to starve the unions of resources, to terminate employees' dues allotments that are also authorized by statute and collective bargaining agreements. *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (last visited August 12, 2025) ("OPM's Guidance").

30.     On August 12, 2025 Michael Watson, the Administrator of the Animal and Plant Health Inspection Service, sent a notice to the President of NAAE informing the union that:

> Based on the EO and as of the date of this notice, APHIS no longer recognizes NAAE as the exclusive representative for employees referenced in the Federal Labor Relations Authority (FLRA) certifications dated November 30, 2021, and March 22, 2023. As a result, the following actions are being taken:
>
> A.    The collective bargaining agreement (CBA) between APHIS and NAAE dated August 21, 2024, and any other negotiated agreements between these parties are no longer in effect. . . .

14

B.    Official time pursuant to 5 U.S.C. § 7131 *et seq.* will no longer be granted to or recorded by employees who previously served as NAAE union representatives under the CBA or other negotiated agreements. . .

C.    Union dues that were withheld from employees' pay and transmitted to NAAE have been stopped.

31.    As a result of Executive Order No. 14,251 and OPM's Guidance, the Defendant Rollins and her subordinates refuse to honor the terms of NAAE's collective bargaining agreement and her and her subordinates' other obligations to the union under the FSLMR Statute. Acting through subordinates, Defendant Rollins has cancelled NAAE officers' use of "official time" within their duty day to perform representational duties; she refuses to process or respond to grievances the NAAE has filed; she refuses to honor union dues allotments from NAAE members' paychecks and she and her subordinates refuse to notify or bargain with NAAE over changes in conditions of employment or in any other way recognize NAAE as the certified collective bargaining representative of PPQ employees.

## CLAIMS FOR RELIEF

### First Cause of Action
### *Ultra Vires*

32.    NAAE reasserts and realleges the allegations contained in paragraphs 1 through 31 as if fully set forth here.

33.    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*. Courts have jurisdiction to grant relief

when the President and his subordinate officials act beyond the scope of their authority and violate the law to the injury of an individual or organization.

34.     The President may exclude an agency or subdivision from coverage of the Federal Service Labor Management Relations Statute *only* if that subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, *and* only if the provisions of the Statute cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

35.     In a case involving civilian personnel matters, the Supreme Court has defined "national security" as "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Cole v. Young*, 352 U.S. 536, 544 (1956).

36.     Relying on *Cole v. Young*, the Federal Labor Relations Authority has defined national security as "only those sensitive activities of the government that are directly related to" protecting the United States "from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense." *Dep't of Energy, Oak Ridge Operations*, 4 F.L.R.A. 644, 655-56 (1980). Section 7 of Executive Order 14251 cites this definition approvingly.

37.     The primary function of USDA's Plant Protection and Quarantine is to protect the nation's agriculture and food supply from ***natural threats*** posed by pests and plant diseases and ***not*** from "internal subversion or foreign aggression."

16

38.     Any responsibility which PPQ may have had to protect plants "from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense" was transferred to Customs and Border Protection by the Homeland Security Act of 2002.

39.     In fact, the FLRA found that the work of APHIS Food Inspectors who inspect incoming cargo did not have "a clear and direct connection to national security" because they "are not responsible for the detection and interception of bio-terrorism agents or weapons of mass destruction, nor have they been trained in such duties." The FLRA found "that CBP plays a leading role in protecting the country against the importation of cargo that poses a risk of terrorism and weapons of mass destruction" as opposed to APHIS which "conducts agricultural inspections of incoming cargo to protect the United States from potential carriers of animal and plant pests and diseases that could cause serious damage to the country's crops, livestock, pets and environment." *U.S. Dep't. of Agric., Food Safety Inspection Serv.*, 61 F.L.R.A. 397, 398 (2005).

40.     Since "national security work" is not a responsibility of APHIS or PPQ, no less its "primary function," the President clearly exceeded the authority granted to him by Congress in 5 U.S.C. § 7103(b) when he exempted APHIS and PPQ from coverage of the FSLMR Statute. In so doing, the Defendant Trump exercised power that was specifically withheld by Congress and acted in contravention of a specific statutory prohibition and therefore his action was *ultra vires.*

41.     Because the Executive Order goes beyond the narrow authority granted by § 7103(b) and thereby impermissibly effectuates a partial repeal of Chapter 71, the Executive Order is ultra vires.

42.     The President is not entitled to any presumption of regularity that might otherwise be due him when he issued Executive Order 14251 because the Defendant was indifferent to the purposes of the Federal Service Labor Management Relations Statute and has acted deliberately in contravention of them. The fact sheet that the White House issued reveals other motives for terminating NAAE's and other labor organizations' collective bargaining rights, as does the sweeping scope of the Order as well as the selective exclusions from the Order of a handful of favored unions (such as the police unions and Border Patrol agents) who are viewed as supporters of the President's agenda.

43.     OPM's March 27, 2025 *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* is also *ultra vires* because it relies on and enforces an illegally issued and invalid Executive Order.

44.     The Defendant Rollins and her subordinates' actions in terminating NAAE's official time, dues allotment, pending grievances and collective bargaining relationship is also *ultra vires* because they rely on and enforce an illegally issued and invalid Executive Order and on illegally issued and invalid *Guidance* from OPM.

18

## Second Cause of Action

### *Violation of NAAE's First Amendment Rights*

45.    NAAE reasserts and realleges the allegations contained in paragraphs 1 through 44 as if fully set forth here.

46.    The right of public employees to assemble and to petition for redress of grievances by filing grievances through a negotiated union grievance procedure is protected by the First Amendment and public employees have a right to be free from retaliation for engaging in such activities. *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434, 1438 (10th Cir. 1990); *Petrario v. Cutler,* 187 F.Supp.2d 26, 31-32 (D. Conn. 2002); *Stellmaker v. DePetrillo*, 710 F.Supp. 891, 892-93 (D. Conn. 1989).

47.    NAAE's grievances against the Trump Administration's termination of probationary and other employees and its demand to bargain and subsequent grievance over the President's elimination of telework constitutes First Amendment activity by NAAE and its members.

48.    The Executive Order retaliates against NAAE and its members for that protected First Amendment activity. Indeed, the White House's Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet explains that "[c]ertain Federal unions have declared war on President Trump's agenda" by "filing grievances to block Trump policies" and that "President Trump refuses to let union obstruction interfere with his efforts."

49.    The Executive Order also constitutes "viewpoint discrimination"

19

because it excludes those labor organizations which have been supportive of the

Defendant Trump. As the Fact Sheet frankly explains, "President Trump supports

constructive partnerships with unions who work with him" but that "he will not

tolerate mass obstruction that jeopardizes his ability to manage agencies with

vital national security missions."

50.    Defendants have also acted to illegally curtail and infringe NAAE's

First Amendment rights by carrying out the Executive Order and terminating

NAAE's collective bargaining rights and abrogating its collective bargaining

agreement and the privileges and benefits NAAE enjoys under the Statute and

which it has negotiated in its collective bargaining agreements.

51.    The Executive Order thus "constitutes a sufficiently adverse action"

against NAAE "to give rise to an actionable First Amendment claim." *Hous. Cmty.*

*Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order, in other words, "would

deter a similarly situated individual of ordinary firmness from exercising his or her

constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir.

2023).

### Third Cause of Action

### *Violation of the Fifth Amendment's Guarantee of Equal Protection of the Laws*

52.    NAAE reasserts and realleges the allegations contained in paragraphs

1 through 51 as if fully set forth here.

53.    The due process guarantee of the Fifth Amendment to the United

States Constitution includes a guarantee of equal protection. *See United States v.*

*Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

54.     "The Constitution's guarantee of equality 'must at the very least mean that a bare . . .  desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973)).

55.     A "bare . . . desire to harm a politically unpopular group" is precisely what motivated the Executive Order's exclusion of 75% of union-represented employees across multiple Cabinet departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported President Trump. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the order is to harm and punish federal unions like NAAE that have voiced opposition to Trump Administration policies and petitioned the government for redress from those policies.

56.     In particular, the Executive Order and actions of the Defendants have denied NAAE and its members of equal protection of the laws because it has stripped them of their collective bargaining rights and simultaneously allowed the employees of U.S. Customs and Border Protection, *to whom PPQ's national security responsibilities were transferred*, to retain their rights under the FSLMR Statute.

## Prayer for Relief

WHEREFORE, the Plaintiff National Association of Agriculture Employees requests judgment against the Defendants:

A.     Declaring that Sections 1(a) and 2(b) of the March 27, 2025 Executive

Order are unlawful and null and void.

B.      Declaring that OPM's March 27, 2025, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, is unlawful as applied to NAAE.

C.      Enjoining Defendant Rollins and all her agents and subordinates from implementing Sections 1(a) and 2(b) of the March 27, 2025 Executive Order.

D.      Enjoining Defendant Rollins and all agents and subordinates from implementing the OPM's March 27, 2025, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* with respect to NAAE.

E.      Enjoining Defendant Rollins and all agents and subordinates from continuing to fail to recognize NAAE as the exclusive representative of the employees of the Plant Protection and Quarantine organizational unit in APHIS and ordering Defendant Rollins and her agents and subordinates to restore NAAE's collective bargaining agreements and relationship with PPQ and to honor the agreements' provisions and any of the FSLMR Statute's provisions concerning dues allotments, official time, use of and access to agency resources.

F.      Awarding Plaintiff reasonable attorney fees and costs incurred.

G.      Ordering such further relief as the Court may deem just and appropriate.

Dated: August____, 2025                     Respectfully submitted,

By:    */s/ Richard J. Hirn*_____
         Richard J. Hirn
         D.C. Bar No. 291849

richard@hirnlaw.com
5335 Wisconsin Ave., NW, Suite 440
Washington, D.C. 20015
(202) 274-1812

*General Counsel*
*National Association of Agriculture*
*Employees*


By:    /s/ Keith R. Bolek
       Keith R. Bolek
       Bar No. 463129
       kbolek@odonoghuelaw.com

       April H. Pullium
       Bar No. 198026
       apullium@odonoghuelaw.com

       O'Donoghue & O'Donoghue LLP
       5301 Wisconsin Avenue, Suite 800
       Washington, D.C. 20015
       (202) 362-0041

       *Attorneys for Plaintiff National*
       *Association of Agriculture*
       *Employees*